Per Curiam:
This case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on April 5, 1968. On May 6, 1968, plaintiff filed a statement pursuant to Rule 62(a) electing to submit the case on the commissioner’s report without exceptions and brief. On May 15, 1968, defendant filed a statement under Rule 62 (b) electing to submit the case on the commissioner’s report without exceptions and brief and moving that the report be adopted by the court and the petition dismissed. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant’s motion to adopt, and adopts the same as the basis for its judgment in this case, without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
*599 OPINION OF COMMISSIONER*
White, Commissioner: Tbe plaintiff, a New York corporation, is suing for $804,000 on tbe basis of an alleged breach by tbe defendant of a contract (No. AF 33 (600)-26137) wbicb tbe plaintiff and tbe defendant (represented by a contracting officer of tbe United States Air Force) entered into on January 19,1954.
It is my opinion that tbe plaintiff is not entitled to recover.

IntrodMctory Statement

Under contract No. AF 33(600)-26137, tbe plaintiff agreed to construct at its own expense a transatlantic cable between New York, New York, and London, England, via Newfoundland, Greenland, and Iceland; tbe cable was to be capable of providing a minimum of 48 duplex teletypewriter channels, or, in tbe alternative, a minimum of 24 duplex teletypewriter channels plus at least one voice channel; the plaintiff was to complete tbe construction of tbe cable within a period of 4 years after tbe date of tbe approval of tbe contract by the Secretary of tbe Air Force; tbe plaintiff agreed to lease to tbe defendant, and the defendant agreed to lease from tbe plaintiff, 13 duplex teletypewriter channels for a period of 10 years following tbe completion of tbe cable; tbe defendant was to have the option, upon reasonable written notice, to obtain by lease any additional channels that might be available and unused; tbe channels leased by tbe defendant were to be for tbe exclusive use of tbe United States Air Force, or any other agency or department of tbe defendant designated by tbe Air Force; tbe defendant agreed to pay the plaintiff for tbe leased channels at the rate of $16,666.67 per channel per month; and all channels in tbe cable not leased to tbe defendant were to be available for commercial use by the plaintiff and its customers. (For tbe sake of convenience, tbe contract described in this paragraph will usually be referred to hereafter in tbe opinion as “the contract.”)
*600 The contract was approved by the Secretary of tlie Air Force on January 11,1955.
The plaintiff prepared plans for the laying of a transatlantic cable that would have a capacity of 120 duplex teletypewriter (or 5 voice) channels. The planned cable, therefore, was to have a capacity greatly in excess of the minimum capacity specified in the contract. As previously stated, all channels not leased to the defendant were to be available for commercial use.
As indicated in the findings of fact, the plaintiff made diligent efforts, and expended a large sum of money, in connection with preparatory work looking toward the construction of the cable that was called for by the contract. However, the plaintiff was not able to construct the cable. Consequently, the plaintiff never made any channels available for the use of the United States Air Force (or any other department or agency of the defendant); and the plaintiff did not make any demand upon the defendant — and no claim is asserted by the plaintiff in the present litigation — for compensation at the rate of $16,666.67 per channel per month, as contemplated by the contract.
The plaintiff contends, however, that its inability to construct the transatlantic cable in accordance with the provisions of the contract was attributable to a breach by the defendant of its contractual obligation to render assistance to the plaintiff, as imposed upon the defendant by the following portion of clause 2 (h) of the contract:
(h) The Government shall render assistance to the Contractor in the following:
(1) Providing foreign cable landing sites and other facilities or approvals necessary to the performance of this contract * * *.
Unfortunately for the plaintiff — which has the burden of proof in the present action — the evidence in the record does not establish the necessary causal connection between, on the one hand, the failure of the defendant to render the degree of assistance which the plaintiff says it was entitled to receive and, on the other hand, the plaintiff’s inability to construct the cable provided for in the contract. On the contrary, it is reasonable to infer from the evidence in the record that the *601 plaintiff would still have been unable to construct tbe cable provided for in tbe contract even if tbe defendant bad provided all tbe assistance that the plaintiff desired from tbe defendant.

Landing License in the United Kingdom

One of tbe “foreign cable landing sites” essential to tbe construction of tbe cable in accordance with tbe terms of the contract was a landing site in tbe United Kingdom, since the proposed cable was to have its eastern terminus in London, England. Accordingly, it was necessary for tbe plaintiff to obtain from tbe government of tbe United Kingdom a license to land tbe proposed cable in tbe United Kingdom.
Tbe plaintiff, together with certain affiliated companies, bad been engaged since 1926 — and perhaps earlier — in tbe business of providing telecommunications service between tbe United States and Europe, including tbe United Kingdom, by both cable and radio. For service to the United Kingdom originating within tbe United States, tbe plaintiff and its related companies were in competition with other American companies, such as RCA Communications, Inc., Western Union Telegraph Co., and Press Wireless, Inc.
It should also be mentioned at this point that tbe American companies engaged in the telecommunications business between tbe United States and tbe United Kingdom were in competition with tbe General Post Office of tbe British government, and that tbe American companies obtained approximately 85 percent of tbe telecommunications traffic originating in tbe United Kingdom and flowing to tbe United States.
In tbe early 1950’s, tbe existing cable system between the United States and the United Kingdom was very old and obsolete, no new cables having been laid since tbe 1920’s.
Transatlantic telephone messages between the United States and tbe United Kingdom were transmitted by radio in tbe early 1950’s. Tbe radio facilities at the United Kingdom end were owned by tbe General Post Office of the British government (which, for tbe sake of convenience, will usually be referred to hereafter in the opinion as “tbe GPO”), and at tbe United States end they were owned by tbe American *602 Telephone & Telegraph Company (“AT&T”). Tolls on such messages were split 50-50 between AT&T and the GPO.
Negotiations between the GPO and AT&T relative to the laying of a transatlantic telephone submarine cable (“TAT-1”) connecting the United States, Canada, and the United Kingdom were begun in 1951 or 1952. During the early phase of the negotiations, the GPO wanted a 50 percent interest in TAT-1. However, after the Canadian government expressed an interest in the telephone cable, the GPO reduced its demand to an interest of 41 percent, which it subsequently acquired in TAT-1. The negotiations ultimately resulted in the construction of TAT-1, which is owned to the extent of 50 percent by AT&T, to the extent of 41 percent by the GPO, and to the extent of 9 percent by the Canadian government.
In early June of 1954, after the contract with which we are concerned was entered into, the plaintiff requested the State Department to render assistance to the plaintiff in obtaining the landing rights — including a landing right in the United Kingdom — and the other governmental authorizations that were necessary in order that the plaintiff could construct the transatlantic cable and discharge its obligations under the contract. Accordingly, several conferences were arranged and held in Washington, D.C., during the latter part of June 1954.
In the morning of June 25, 1954, there was held at the State Department a meeting that was attended by representatives of that Department, of the United States Air Force (“USAF”), and of the plaintiff. At that meeting, the USAF advised the State Department that the USAF had a compelling need for the facilities that were provided for in the contract; and that in order to obtain those facilities, it was important to the USAF that every means available to the defendant be used to obtain the necessary governmental approvals and authorizations as promptly as possible.
Later in the day of June 25,1954, a second conference was held at the State Department, attended by representatives of that department, of the USAF, and of the plaintiff. A rumor had reached the State Department through a competitor of the plaintiff to the effect that an official of the GPO had *603 stated that the plaintiff would not be granted a landing license in the United Kingdom. In view of this rumor, it was decided by the conferees that every effort should be made to obtain all possible support at the highest levels of the defendant preparatory to approaching the government of the United Kingdom.
On June 30, 1954, a conference was held in the office of Deputy Under Secretary of State Kobert Murphy. This conference was attended by Mr. Murphy, other representatives of the State Department, and representatives of the plaintiff. Mr. Murphy recognized the national interest involved in the completion of the proposed cable project (which had been given the code name of “Deep Freeze”), and he proposed that negotiations with the government of the United Kingdom to procure a landing license be commenced by means of a letter from the Secretary of State to the United States Ambassador in the United Kingdom, and that the initial presentation be made by the United States Ambassador to the highest British Foreign Office level. Mr. Murphy also stated that the State Department would do everything in its power to assist the plaintiff in bringing its negotiations with the United Kingdom (and other foreign governments from which landing rights were needed) to a satisfactory conclusion; and he offered to make a State Department representative available to assist the plaintiff in those negotiations.
The Deep Freeze cable project was discussed on August 6, 1954, at a meeting of the interdepartmental Telecommunications Planning Committee, composed of representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and the Federal Communications Commission (“FCG”). A motion was unanimously adopted to the effect that it w'as “the sense of the Telecommunications Planning Committee that the State Department request its embassy in London to arrange for Admiral Stone [the plaintiff’s president] to discuss * * * with government of the United Kingdom, the conditions under which the United Kingdom might grant a landing license; further the State Department be authorized to inform Admiral Stone of the position of the Executive Branch that it is most desirable to have the facility fully owned by United States citizens.”
*604 On 'September 2, 1954, the Department of State informed the American Embassy in the United Kingdom of the general nature of the proposed Deep Freeze cable project, and that it was a necessary military requirement of the United States. The embassy was informed that representatives of the plaintiff would soon proceed to the United Kingdom for the purpose of discussing the question of a landing license. The embassy was “requested to lend every possible 'assistance to the representatives of the Company [plaintiff], stressing particularly the defense factors involved.”
In early September of 1954, Admiral Ellery W. Stone, the plaintiff’s president, and John Hartman, another representative of the plaintiff, traveled to London for the purpose of commencing negotiations with the British government in an attempt to obtain a landing license in the United Kingdom. The plaintiff’s representatives were accompanied by T. H. E. Nesbitt, of the State Department, who had an extensive background of experience in the field of communications and who had been detailed by the State Department to assist in the negotiations because of the importance which the defendant attached to the Deep Freeze project and because of the complicated telecommunications factors involved in it. On September 9, 1954, Admiral Stone and Mr. Hartman, assisted by Mr. Nesbitt and personnel of the American Embassy in London, began negotiations with the British government, represented by the GPO, with a view toward procuring a license to land the proposed Deep Freeze cable in the United Kingdom.
In the early stage of the negotiations, the GPO noted that the proposed cable would contain sufficient telegraph capacity to equal the entire Atlantic cable facilities tbp.n in existence, and the GPO indicated that it would have to look carefully at the effect of a sudden opening of such vast new capacity in the Atlantic telegraph service. The negotiations continued until about the middle of September. The plaintiff’s representatives were given to understand that the GPO had taken the proposal concerning the Deep Freeze cable project under advisement, and that in due course a reply would be received by the plaintiff from the GPO. In this connection, the GPO informed the plaintiff that it would *605 take some time for a determination to be made. The plaintiff’s representatives left London in the middle of September 1954.
In order to overcome the objections of the GPO, the plaintiff sought, through the State Department, to have the military authorities of the defendant make representations to the British military authorities respecting the vital military need for the proposed Deep Freeze cable. Pursuant to the plaintiff’s request, the defendant’s Joint Chiefs of Staff submitted to the British Chiefs of Staff a memorandum dated October 15, 1954, stating (among other things) that the Joint Chiefs of Staff supported the establishment of the proposed cable, that they had concluded “that there are important strategic needs for this cable,” that they viewed the proposed cable “as having a definite potential strategic value and a requirement for national defense and NATO,” and that the Department of Defense concurred in the importance of the cable. The memorandum concluded by stating that the Joint Chiefs of Staff “would be most grateful if the British Chiefs of Staff could support their views on the North Atlantic cable proposal and convey these views to the Government of the United Kingdom.”
On March 10, 1955, the government of the United Kingdom informed the Department of State that although the former had “no desire to stand in the way of the provision of a new cable if it is essential to defence,” the government of the United Kingdom could not “see their way to permitting the projected cable to be used for purposes other than defence.” The State Department promptly informed the plaintiff concerning this note from the government of the United Kingdom.
On March 18, 1955, the Department of State replied to the British note of March 10 and stated (among other things) that “the Government of the United States reaffirms the urgent necessity of its defense requirements”; that “The United States Government appreciates the difficulties occasioned by certain commercial aspects of the proposed cable system and suggests that they might properly form the subject of further negotiations” between the British government and the plaintiff; and that the United States *606 Government “urges the continuation of such negotiations and earnestly requests that the British Government give appropriate consideration to the views and requirements of the United States Government as set forth in this note.”
In early April of 1955, the GPO informed personnel of the American Embassy in London that American companies had long held a predominant position in the telegraph business between the United States and the United Kingdom, and the GPO “had for some time aspired for a larger share of it,” and that the GPO “visualized increased * * * participation in two forms: (a) part ownership of the ‘Deep Freeze’ undertaking * * * and/or (b) utilization of certain ‘excess capacity’in the‘TAT’cable for telegraphic purposes * * It was indicated that if the desire of the GPO partially to utilize TAT-1 for telegraph traffic to and from the United States were to matei-ialize, the granting of a landing license to the plaintiff would be greatly facilitated. Information concerning the position of the GPO was transmitted by the American Embassy in London to the Department of State.
On June 8, 1955, the government of the United Kingdom reaffirmed the position which it had taken on March 10,1955 to the effect that the British government was still unable to agree to the use of the proposed Deep Freeze cable for commercial purposes, although it had no desire to stand in the way of the construction of a new cable for defense purposes alone.
At a conference between Admiral Stone and an official of the GPO that was held in London on June 15,1955, Admiral Stone was advised that the GPO was prepared to consider alternative proposals, possibly involving partial ownership of the proposed Deep Freeze cable by the GPO. It was the position of the GPO that a commercial facility owned, controlled, and operated wholly by an American organization “would get nowhere.”
On June 16,1955, Admiral Stone conferred in London with the British Postmaster General. It was the latter’s position that the American carriers already had a dominant position in transatlantic communications, and the proposed Deep Freeze cable would intensify such dominance; and that, because of this, the GPO could not agree to 100 percent *607 ownership of Deep Freeze by the plaintiff. On the other hand, the British Postmaster General expressed the opinion that in view of the heavy investment of the GPO in TAT-1, it was unlikely that Parliament would authorize a further investment in Deep Freeze. Nevertheless, the British Postmaster General indicated a willingness to consider “any alternative offer,” although lie was unable to see any probabilty of agreement. During the course of the conference, the British Postmaster General expressed confidence in ultimately being able to get telegraph service into the United States via TAT-1.
On June 23, 1955, Admiral Stone and John Hartman, representing the plaintiff, conferred with representatives of the State Department in Washington, and fully advised them of the then-current status of the negotiations with the government of the United Kingdom. The plaintiff’s representatives expressed the opinion that if further negotiations with the United Kingdom were to be successful, it would be necessary to give the GPO concessions in the nature of an ownership interest in the proposed Deep Freeze cable.
Admiral Stone and John Hartman returned to London and participated in further discussions with the GPO during the period October 10-28,1955, relative to the proposed Deep Freeze project. The purpose of plaintiff’s representatives was to propose participation in the project by the GPO, in view of the objections previously made by the GPO to the construction of a cable with commercial capacity that would be wholly owned by the plaintiff.
The initial proposal submitted by the plaintiff to the GPO during the October 1955 discussions was that the GPO participate in the Deep Freeze project from the outset, either (1) by acquiring a share in the ownership of the cable as a whole (as had been done by the GPO in connection with TAT-1), or (2) by undertaking to provide a section of the cable. The GPO representatives expressed doubt concerning the financial soundness of the Deep Freeze project; and they also took the position that even if the financial uncertainties of the project could be eliminated, participation would be unattractive to the GPO because of the nature of the route.
The representatives of the plaintiff next submitted an alter *608 native proposal to the GPO, under which the plaintiff would proceed with the Deep Freeze project without participation by the GPO initially, and the GPO would have an option to purchase a share in the project at the end of a period that was to be agreed upon and of sufficient length to permit the technical and financial soundness of the new cable to be established. The representatives of the GPO indicated that they did not find the plaintiff’s alternative proposal to be satisfactory, since the objections that led the GPO to reject the plaintiff’s 1954 proposal, under which the new cable would be wholly owned by the plaintiff, applied with equal force to the alternative proposal outlined in this paragraph, since the proposed cable would be wholly owned by the plaintiff unless and until the GPO exercised its option. In the meantime, the transatlantic cable capacity in American ownership would be substantially increased.
At the conclusion of the October 1955 discussions, the representatives of the GPO agreed that the plaintiff’s alternative proposals would be submitted to the British Postmaster General, who, in turn, would probably make a recommendation to the British cabinet.
Upon returning to the United States after the conclusion of the October 1955 negotiations, Admiral Stone informed representatives of the State Department and all other interested agencies of the defendant regarding the nature and outcome of the discussions in London.
In a letter dated February 21, 1956, the plaintiff was informed by the GPO that the latter had come to the conclusion “that it would not be possible to consider the ‘Deep Freeze’ project independently of a full review of the future arrangements for transatlantic telecommunications services,” and that it was not known at that time just when such review would be completed.
The evidence in the record clearly shows— and the plaintiff does not make any contention to the contrary — that up until the beginning of May 1956, at least, the defendant rendered to the plaintiff all the assistance that the plaintiff could reasonably expect in connection with its efforts to obtain a cable landing license in the United Kingdom. However, with respect to May 1956 and thereafter, the plaintiff asserts in its *609 brief that “beginning in May 1956 defendant abruptly stopped rendering the assistance it was required to give,” with the result that the plaintiff was unable to obtain a cable landing license in the United Kingdom and, hence, was unable to perform the contract.
Tn connection with the contention referred to in the last sentence of the preceding paragraph, the plaintiff has a twofold burden: first, it must show that in May 1956 and thereafter the defendant failed to render the assistance required by clause 2(h) (1) of the contract; and, second, the plaintiff must show that the defendant’s default in this respect was responsible for the plaintiff’s inability to obtain a cable landing license in the United Kingdom. The events of May 1956 and thereafter must be considered in the light of the plaintiff’s burden.
It having been learned that the British Postmaster General intended to send to the United States a delegation to discuss with representatives of the defendant the possibility of “a package deal” relative to transatlantic communications between the United Kingdom and the United States, meetings were held in Washington, D.C., on May 4, 7, and 8,1956 between representatives of the State Department, the Department of Defense, the Office of Defense Mobilization, and the FOG, for the purpose of attempting to arrive at a position to be taken by the defendant with respect to the matters that were to be discussed with the British delegation. At the meeting on May 7, there was a discussion regarding the “vital need for Deep Freeze” and the “price” that the defendant should pay in obtaining Deep Freeze; and at the meeting on May 8 it was agreed that Assistant Secretary of Defense Pike would explore the position of the Department of Defense as to the importance at that time of the Deep Freeze cable project to national security, under the assumption that arrangements for this telegraph cable could be obtained only if it were agreed that the United Kingdom could have a partial ownership interest in the cable and that this would result in serious impairment to the economic success, or possibly the continued existence, of the telegraph cable facilities already in operation across the North Atlantic.
*610 In accordance with, tbe 'arrangement made at the meeting on May 8, Assistant Secretary Pike wrote a letter on May 10, 1956 to the Director of the Office of Defense Mobilization, stating in part as follows:
* * * I can advise you that if, in the judgment of you and others in a position to form a conclusion, the “Deep Freeze” project, through joint ownership, is definitely established as jeopardizing the other in being trans-Atlantic telegraph services, then the Department of Defense would consider such an economic outcome as outweighing the importance to national security of the proposed cable. * * *
Meetings were held in Washington, D.C., on May 16, 17, 18, 22, 23, 24, and 25, 1956 between delegations representing the defendant and the United Kingdom concerning telegraph service between the United States and the United Kingdom. The delegation from the United Kingdom included representatives of the GPO and personnel from the British Embassy in Washington. The defendant’s delegation included representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and the FCO.
The British desire that TAT-1 should be used for telegraph service as well as for telephone service was 'discussed at a morning meeting on May 22, 1956. The defendant’s delegation took the position that the defendant’s policy was against the use of TAT-1 for telegraph service, except in case of national emergency or if the FOO should determine, in the public interest, that adequate facilities at reasonable rates were not available via telegraph carriers, in which case telegraph service should be provided by the leasing of channels in TAT-1 by existing telegraph carriers.
The matter of the proposed Deep Freeze cable was discussed at an afternoon meeting on May 22,1956. In response to an inquiry from the British delegation as to whether an agreement between the United Kingdom and the plaintiff under which the GPO would have an ownership interest in the Deep Freeze cable would be acceptable to the defendant, without the GPO obtaining similar interests in the existing transatlantic telegraph cables operated by American companies, a Commissioner of the FCC, who was a member of *611 the defendant’s delegation, said that expressed defense needs had been the motivating factor of the project, which had originally been for a cable in the sole ownership of the plaintiff; that the FCC had given approval to the project in principle so that negotiations might proceed; that subsequent to the time when the approval in principle was given, the circumstances had changed, noticeably in respect to the possibility of participation by the GPO in the project; and that the delicate balance among the American telegraph carriers in the North Atlantic might be affected in different ways, depending on the nature and extent of participation by the GPO in Deep Freeze and on the way in which the United Kingdom dealt with the other American carriers. A member of the British delegation commented that the Deep Freeze proposal had been presented to the United Kingdom with the support of the defendant, but that there was now considerable doubt as to whether a contract on that basis would be regarded favorably by agencies of the defendant.
No agreement was reached during the May 1956 meetings on the matters mentioned in the two immediately preceding paragraphs of this opinion.
In a communication dated July 2, 1956, the British Postmaster General wrote a letter to the plaintiff, stating in part as follows:
Had this matter been one of military necessity and had the intention been to use the cable for defence purposes only, there would, as you know, be no obstacle on our part. But considering it, as we must, as a commercial project, my view is that there is no immediate or urgent need for a new facility of this kind; moreover, it seems to me that the proposed cable is an uneconomic and geographically hazardous method of providing Transatlantic telegraph circuits. In these circumstances, I have been obliged to reach the conclusion that your proposals cannot be accepted. * * *
It is the plaintiff’s theory that the Defense Department breached clause 2(h) (1) of the contract by abandoning in May 1956 the efforts “to give strong and vigorous support on the highest levels to Deep Freeze to obtain approval from the British”; and that, as a result, “The British immediately learned that Deep Freeze was no longer regarded by the *612 United States as being an urgent military necessity, and promptly rejected plaintiff’s revised proposals.” However, the plaintiff has failed to prove that it was a “softening” of the position of the Defense Department on the military importance of the Deep Freeze cable project that caused the GPO finally to reject the plaintiff’s request for a landing license in the United Kingdom.
The evidence shows that the GPO was chiefly motivated by a desire to obtain an agreement whereby TAT-1, which was owned to the extent of 41 percent by the GPO, could be used for telegraph service as well as for telephone service. The defendant’s delegation at the May 1956 meetings opposed this proposal by the GPO. However, the plaintiff cannot complain about the action of the defendant’s delegation in this respect, because the position of the defendant’s delegation regarding the use of TAT-1 for telegraph service was in conformity with a recommendation which the plaintiff had previously made to the defendant.
With respect to the Deep Freeze project, the evidence in the record warrants the inference that perhaps (there is no clear-cut showing on this point) the GPO would have been willing to approve and grant a landing license for this project if — and only if — the defendant could have been persuaded through negotiations (1) to agree to the use of TAT-1 for telegraph service, and (2) to agree to a revision of the Deep Freeze project so that the GPO might have an ownership interest in the proposed Deep Freeze cable, without the GPO being required to procure ownership interests in the existing transatlantic telegraph cables operated by American companies. Accordingly, when it became apparent to the GPO that the defendant’s firm opposition to the use of TAT-1 for telegraph service ruled out the possibility of a “package deal” under which the opening of TAT-1 for telegraph service might be obtained if the GPO would approve the Deep Freeze project under a revised plan whereby the proposed cable would be jointly owned by the plaintiff and the GPO, any chance of the GPO granting a landing license for the Deep Freeze project disappeared.
Throughout the entire history of the negotiations with the GPO concerning the Deep Freeze project, the GPO indicated *613 that a landing license would not be granted for the project as outlined in the contract — i.e., a transatlantic cable which was to be owned by an American company and which was to be used partially for commercial purposes and partially for military purposes. This firm line on the part of the GPO was taken long before the supposed “softening” of the Defense Department’s position on the military importance of Deep Freeze in May 1956. Even when the plaintiff proposed to the GPO in October 1955 that the latter participate in the Deep Freeze project by acquiring a share in the ownership of the proposed cable, the GPO did not display any real interest in the proposal. The GPO not only expressed doubt concerning the financial soundness of the Deep Freeze project, but also took the position that even if the financial uncertainties of the project could be eliminated, participation would be unattractive to the GPO because of the route. Then, when the plaintiff’s request for a landing license was finally turned down by the British Postmaster General, it was on the ground that there was no immediate or urgent need for a new telegraph cable having commercial capacity, and that the proposed cable was “an uneconomic and geographically hazardous method of providing Transatlantic telegraph circuits.” Thus, the GPO was opposed to Deep Freeze before, during, and after May 1956, although the GPO might possibly have been willing to approve the project as a “price” for obtaining the defendant’s consent to the use of TAT-1 for telegraph service, if this could have been coupled with a revision of the Deep Freeze plan so that partial ownership of Deep Freeze could be acquired by the GPO.
Therefore, it must be concluded that the evidence fails to establish that the plaintiff’s inability to obtain a cable landing license in the United Kingdom was caused by the defendant’s failure, in May 1956 and thereafter, to render assistance to the plaintiff m connection with the project outlined m the contract. Rather, the evidence warrants the inference that even if the defendant in May 1956 and thereafter had continued to render the same sort of assistance to the plaintiff which the defendant had rendered up until May 1956, the GPO would still have refused to grant a landing license for the cable envisioned by the contract.

*614
Landing License in the United States

It was also necessary for the plaintiff to obtain a license to land the Deep Freeze cable in the United States. Applications for such licenses were and are handled by the FCC.
On the basis of an informal presentation by the plaintiff, with support from the USAF, the Joint Communications Electronics Committee of the Joint Chiefs of Staff, and the interdepartmental Telecommuncations Planning Committee, the FCC on August 12, 1954 “approved in principle” the proposed Deep Freeze cable, but reserved “the right upon application by the company [i.e., the plaintiff] for a United States cable landing license, to impose such terms and conditions as the Commission finds to be required in the public interest upon thorough investigation of the facts and considerations which may be brought to its attention.”
Subsequently, after the Department of Defense stated in the letter dated May 10,1956 that if it were determined that the Deep Freeze project would jeopardize economically the existing transatlantic cable services, then the Department of Defense would consider such an economic outcome as outweighing the importance to national security of the proposed Deep Freeze cable, the FCC on September 19,1956 withdrew its approval of the Deep Freeze project in principle. In doing so, however, the FCC stated that it “was not prejudging this matter,” and that if and when a formal application for a cable landing license in the United States was subsequently submitted by the plaintiff, the application would be considered de novo in the light of a complete investigation of all relevant factors.
The plaintiff contends that the “softening” of the Defense Department’s attitude on the military importance of the Deep Freeze project, as reflected in the letter dated May 10, 1956, involved a breach by the Defense Department of the obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract. Assuming (but not deciding) that the plaintiff is correct in this contention, the evidence in the record fails to establish that the plaintiff would have been able to construct the cable under the contract if the Defense *615 Department bad not “softened” its support of the Deep Freeze project and if the FCC had not withdrawn its approval in principle of Deep Freeze. It should be noted in this connection that the action of the FCC on September 19, 1956 in withdrawing its approval in principle of Deep Freeze occurred after the British Postmaster General had formally-rejected the plaintiff’s proposal on July 2, 1956. Without a landing license in the United Kingdom, it was impossible for the plaintiff to construct the cable called for by the contract.
In the final analysis, it appears that the plaintiff’s inability to construct the cable under the contract was due to the plaintiff’s failure to obtain a landing license in the United Kingdom, and that, as indicated in the preceding part of this opinion, the plaintiff has failed to establish that its failure to obtain a landing license in the United Kingdom was attributable to a breach by the defendant of the latter’s obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract.

Abandonment of Project

On September 26,1956, the plaintiff was orally advised by the USAF not to incur any further expenses in connection with the Deep Freeze project until the USAF decided what it was going to do in view of the then-prevailing circumstances. This advice was further confirmed by the USAF on October 29,1956.
In a letter dated June 13,1958 and addressed to the USAF, the plaintiff referred to the advice which it had received from the USAF in September 1956, and subsequently, to the effect that the plaintiff should not incur any further expenses under the contract. The plaintiff mentioned the substantial period of time that had elapsed since the receipt of such advice, and stated the plaintiff’s understanding that the Deep Freeze project was to be replaced by another transatlantic cable project that would be used only for military purposes. The plaintiff then requested “that the subject contract be terminated for the convenience of the Government pursuant to clause 1 thereof.”
*616 The reply of the USAF to the plaintiff’s letter of June 13, 1958 stated in part as follows:
* * * The contract obligated the Government to lease certain channels on a cable which you were to construct. Since the cable has not been completed, the Government would appear to have no obligation which can be terminated.
The present action, alleging a breach by the defendant of its obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract, was subsequently filed on June 2, 1960.

Goncl/usion

For the reasons stated in the previous parts of this opinion, the plaintiff is not entitled to recover, and the petition should be dismissed.
FINDINGS on Fact
1. (a) The plaintiff is, and at all relevant times was, a New York corporation.
(b) During all relevant periods, the plaintiff was a wholly owned subsidiary of American Cable and Eadio Corporation and operated as a unit within the American Cable 'and Eadio Corporation system, which included, in addition to the plaintiff, All American Cables & Eadio, Inc. (a New York corporation), Mackay Eadio & Telegraph Co. (a Delaware corporation), and Commercial Cable Co., Ltd., (an English corporation and a wholly owned subsidiary of the plaintiff).
(c) American Cable and Eadio Corporation was, during the period 1950-1959, substantially controlled by International Telephone & Telegraph Corporation, which owned a majority of American Cable and Eadio Corporation’s stock. International Telephone & Telegraph Corporation also owned or controlled during the period mentioned a number of other companies, including Standard Telephones & Cables, Ltd. (an English corporation).
(d) At the present time, American Cable and Eadio Corporation is a wholly owned subsidiary of International Telephone & Telegraph Corporation.
*617 (e) The consolidated operation of which, the plaintiff was and is a part (see paragraph (b) of this finding) has been in operation since 1926, at least, providing telecommunications service between the United States and Europe, including the United Kingdom, by both cable and radio.
(f) For service to Europe, originating within the United States, the plaintiff and its related companies were, during all relevant periods, in competition with other domestic companies, such as EGA Communications, Inc., Western Union Telegraph Co., and Press Wireless, Inc.
2. As contrasted with the several privately owned American carriers mentioned in finding 1 (f), which were in competition with each other in the domestic and international telecommunications industry, most foreign telecommunications operations were, during the periods relevant to this litigation, conducted by foreign governments themselves or by government-owned or government-controlled corporations. For example, the substantial international and domestic telecommunications network under British ownership was owned or controlled by the General Post Office, an agency of the British government; and this included the extensive operations of a nationalized former private operating company, Cable and Wireless, Ltd.
3. (a) In the early 1950’s, international telegraph service between the United States and the United Kingdom was provided by both cable and radio. However, the existing cable system was very old and obsolete, no new cables having been laid since the 1920’s.
• (b) At the time mentioned in paragraph (a) of this finding, the American companies engaged in the transatlantic communications business were in competition with the General Post Office of the British government, and obtained approximately 85 percent of the telecommunications traffic originating in the United Kingdom and flowing to the United States.
4. (a) By 1951, developments stemming from wartime research had paved the way for a substantial advance in the technique of communicating over long distances by means of a submarine cable. In particular, the laying of a high- *618 capacity, broad-band, repeatered coaxial cable became feasible. In addition to standard message service (charged for on the basis of the characters transmitted), such a cable, because of its high capacity and speed, could make provision for extensive leased channel service and make possible the extension of telex service internationally. (The cables in existence up to the 1950’s did not have the requisite capacity or speed of operation for this type of service.)
(b) Leased channels permit the lessee to utilize the channel leased for its own communication purposes over long periods of time.
(c) Telex is a telegraph service similar to a telephone call in that it is provided on a flat rate per so many minutes, but the stations, connected by cable, communicate by teleprinters. In the beginning 1950’s, telex service to the United Kingdom from the United States was in existence only by radio, with the United States side being handled by EGA Communications and the British side being handled by the General Post Office of the British government. Because telex service required complicated and expensive equipment, the General Post Office dealt with only one American record carrier (ECAC) to avoid duplication of these facilities.
(d) The capacity of the repeatered coaxial submarine cable which became feasible after the 1950’s is expressed in either of two ways, voice channels or standard telegraphic channels. One channel, suitable for voice transmission, could be broken down into 24 channels suitable for telegraphic use. Thus, the modern repeatered coaxial cable, which became practical in the 1950’s, had a potential for either telephonic (voice) or telegraphic (record) usage, or for both.
5. Beginning as early as the period' 1950-1951, at least, the United States Air Force (hereinafter “the USAF”) had a defense requirement for overseas communications to Greenland, Iceland, and the United Kingdom, and the available facilities were inadequate to meet such requirement. The available communications facilities to Greenland and Iceland, in particular, were unreliable and unsatisfactory.
6. The Director of Communications, Headquarters, USAF, had budgeting and financial responsibility for the leasing of *619 communications facilities for the USAF, and the implementation of leased facilities.
7. (a) Sometime prior to November 1952, the USAF approached the plaintiff concerning the latter’s possible interest in meeting the defense requirement referred to in finding 5 through the laying of a transatlantic cable.
(b) The USAF indicated that it desired to have a new transatlantic cable laid as fast as the project could reasonably be accomplished.
(c) The USAF indicated that military communications with its bases in Iceland and Greenland were poor, and there was a strong need for improvement in this respect. There was no cable to Greenland in existence at the time and, consequently, the only means of communication to Greenland was by radio. There was no cable from the United States to Iceland, and the only direct means of communication between the United States and Iceland was by radio. Eadio communications in extreme northern latitudes are very unreliable, due to the effect of the northern magnetic pole and the concentration of certain electrical influences in the atmosphere because of the magnetic pole. There was a cable at the time from the United Kingdom to Iceland, but it was owned by The Gi’eat Northern Telegraph, a Danish company, and cable messages from the United States to Iceland had to be routed to the United Kingdom, and then relayed on to Iceland. The USAF indicated that the only satisfactory means of obtaining constant military communication between the United States, on the one hand, and Greenland and Iceland, on the other hand, would be through the construction of a new cable.
(d) Also, the USAF indicated that military communications with the United Kingdom needed to be expanded. However, the situation here was not as critical as it was with respect to Greenland and Iceland because there were already in existence various alternative means, both cable and radio circuits, by which military communications could be routed.
(e) The USAF indicated that the laying of a new transatlantic cable was of immediate strategic importance and was vital to the interests of the United States.
(f) The plaintiff informed the USAF that it was interested in the project outlined by the USAF.
*620 8. (a) Under the date of June 17, 1953, a contracting officer of the Air Materiel Command, USAF, sent to the plaintiff a letter stating in part as follows:
Confirming the discussion held at this Headquarters with your representatives on 17 June 1953, you are requested to submit a proposal to furnish Trans-Atlantic Submarine Cable Services from New York, New York to a point in the United Kingdom as outlined in attached Exhibit “A” [to London, England, via Newfoundland, Greenlandj and Iceland].
It is anticipated that any contract resulting from your proposal will be a Fixed Price contract. It is proposed that the contract should be written to include two (2) items of work as follows:
a. Your company will agree to install a TransAtlantic Submarine Cable of not less than four (4) channels between the points specified in Exhibit “A”.
b. Your company will agree to lease four (4) channels to the Air Force on a year-to-year basis with renewal options for a ten (10) year period.
H* $ $ ‡ $
Due to the fact that this office has not received complete information and approval of contract form for this service, it is not proposed to provide herein special information as to contract form or special provisions required by the Air Force. If your proposal is accepted, a proposed draft of a contract will be submitted to you for concurrence based on mutual understandings between your company and the Air Force as a result of future negotiations.
It is requested that your proposal be submitted so as to reach this office by 16 July 1953.
(b) Exhibit “A” attached to the letter referred to in paragraph (a) of this finding stated in part as follows:
1. Nmnder of Oharmels: Four (4) — each of which shall operate as duplex teletypewriter telegraph channels, each channel capable of operating with on-line cryptographic equipment at a speed of not less than sixty (60) words per minute simultaneously in each direction and capable of being operated as a communications multipoint facility from the Zone of Interior and the United Kingdom, and at points in Newfoundland, Greenland and Iceland.
*621 7. Air Force Assistance: The Air Force agrees to render assistance to the contractor in the following:
a. Providing foreign cable landing sites.
b. Provide logistical support in Greenland, on a reimbursable basis, as may be available and necessary to the functioning of the cable landing station.
c. Aid in obtaining material priorities, where necessary.
*5» v »!• % •fc
9. Responsibility: Besponsibility for construction and installation of cable shall rest entirely with the Contractor.
10. Termination: Should the Air Force exercise the right to terminate for convenience or fail to exercise renewal options for the full ten-year period, the maximum liability shall not be in excess of the total lease charges for the contract period.
9. Approaches similar to those referred to in findings 7 and 8 were made by the USAF to companies other than the plaintiff.
10. (a) The plaintiff submitted a proposal in response to the invitation referred to in finding 8. The plaintiff’s proposal contemplated the laying of a cable capable of providing either 48 telegraph (teletypewriter) channels or 24 telegraph channels and 1 voice channel.
(b) Subsequently, the USAF advised the plaintiff that its proposal was the most desirable of those submitted to the USAF.
11. (a) Negotiations between the plaintiff and the USAF concerning the form of the contract to be executed by the parties began in the summer of 1953 and continued until a formal contract was signed by a contracting officer of the USAF in January 1954.
(b) The proposed contract went through more than half a dozen different drafts, with changes from one draft to the next, before it was approved and signed in its final form.
(c) With respect to the matter referred to in paragraph 7-a of exhibit “A” to the letter dated June 17, 1953 (see finding 8(b)), the early versions of the proposed contract stated that “The Government shall render assistance to the Contractor in the following: (1) Providing foreign cable landing sites.” Stuart Marks, who was then the attorney for *622 the plaintiff, told representatives of the USAF that such language was too restrictive and that the plaintiff needed assistance of a broader scope from the Government; and Mr. Marks suggested that this particular provision be expanded to include the additional language, “and other facilities or approvals necessary to the performance of this contract.” Mr. Marks’ suggestion was accepted by the USAF, and the provision, as expanded, became clause 2(h)(1) of the contract, as finally approved and executed.
12. On J anuary 19,1954, a negotiated contract numbered AF 33(600)-26137 (hereafter “the contract”) was entered into between the plaintiff and the defendant (represented by a contracting officer of the USAF). In accordance with its terms, the contract became effective upon approval thereof in writing by the Secretary of the Air Force on J anuary 11, 1955.
13. The contract contained the following provisions (among others) :
1. SERVICES TO BE FURNISHED
(a) The Contractor shall, during the period set forth in paragraph (a) of Clause 3 hereof, furnish and supply to the Government for the Department of the Air Force, or to any other agency or department of the Federal Government designated by the Department of the Air Force, communication services consisting of the exclusive use of thirteen (13) Duplex Teletypewriter Channels in the trans-atlantic submarine cable facilities to be provided by the Contractor in accordance with the provisions of Clause 2 of this contract. Said thirteen (13) channels shall consist of ten (10) channels capable of operating directly between New York and London and three (3) channels capable of being operated by the three (3) intermediate stations specified in paragraph (a) of Clause 2 in a manner which will permit one of the three (3) channels to be used as a multi-point facility by each intermediate station.
(b) During the period of this contract and upon receipt of reasonable written notice from the Government, the Contractor shall make available to the Air Force or to any other agency or departments of the Federal Government available unused channels in the cable in addition to the thirteen (13) channels specified in paragraph (a) at the rates specified in Clause 5.
*623 (c) In the event of any interruption of services required to be furnished by the Contractor hereunder, the Contractor shall, to the extent available, provide service from alternate channels in the Contractor’s existing facilities for use in such manner as to provide for a continuation of the communication services desired. Payment for services from alternate channels will be at the rates established with the consent of any appropriate regulatory body for said channels.
2. CABLE FACILITIES
(a) The Contractor shall, at its expense, provide the facilities required to furnish communication services to the Government called for under paragraph (a) of Clause 1 between New York, New York, and London, England via Newfoundland, Greenland and Iceland. It is understood and agreed that said facilities include but are not limited to the laying, installation, operation and maintenance of a Trans-Atlantic Submarine Cable, cable stations and related equipment. Said cable shall be a .62 coaxial cable, armored with steel wires, insulated with polyethelene and equipped with underwater electronic repeaters. The Contractor shall provide multi-point facilities between its intermediate cable stations in Newfoundland, Greenland, and Iceland and the respective USAF locations :at St. Johns, Newfoundland; Narsarassauk, Greenland; and Keflavik, Iceland, including submarine cable or wire connections between said intermediate cable stations and the respective Air Force locations in Newfoundland, Greenland, and Iceland, and equipment necessary to operate such multi-point facilities at said Air Force locations, except that the Contractor shall not provide cryptograph equipment or buildings necessary to house any equipment located at the Government’s own terminal or multi-chan-nel points. Said cable shall be capable of providing — ■
(1) a minimum of forty-eight (48) duplex teletypewriter channels, each capable of operating with or without on-line cryptograph equipment at a speed of sixty (60) words per minute simultaneously in each direction; or alternatively,
(2) a minimum of twenty-four (24) duplex teletypewriter channels,. each capable of operating with or without on-line cryptograph equipment at a speed of sixty (60) words per minute simultaneously in each direction, plus at least one voice channel.
*624 (b) The Contractor agrees to commence the construction of the cable facilities to be provided hereunder as soon as practicable after date of execution and approval by the Government of this contract. The Contractor may proceed forthwith with any action necessary or appropriate to such construction, including the placing of orders for cable, repeaters and associated equipment, provided that the Contractor shall not place any order for cable until it obtains all governmental approvals, foreign or domestic, required under existing law for the performance of this contract. The Contractor agrees to complete the construction of the entire cable within a period of four (4) years after the date of approval of this contract as required under Clause 23.
(c) The date on which all facilities, required to be installed, operated and maintained by the Contractor to furnish services hereunder, are first ready to provide communication services to the Government is referred to in this contract as the “Completion Date.”
# % * *
(e) The Contractor, at its expense, shall furnish, install and maintain all facilities required to be furnished under this contract. Title to all such facilities shall be and remain in the Contractor and the Contractor shall be responsible for all loss of or damage to such facilities. * * *
$ ^ ‡ Í
(h) The Government shall render assistance to the Contractor in the following:
(1) Providing foreign cable landing sites and other facilities or approvals necessary to the performance of this contract,
(2) Providing logistical support in Greenland as may be available to the Government and necessary to the construction and function of the cable landing-station in Greenland, the Contractor to reimburse the Government for the reasonable cost of such logistical support furnished by the Government,
(3) Obtaining material priorities, where necessary, and
(4) Making appropriate statements to the proper governmental agencies, if requested, in connection with any application by the Contractor for a certificate of necessity under Section 124(A) of the Internal Kevenue Code.
*625 3. PERIOD OF PERFORMANCE
(a)The Contractor shall furnish the thirteen (13) channels of Cable Communication Services called for in paragraph (a) of Clause 1 during the period commencing on the Completion Date and ending ten (10) years after the date of approval of this contract is required under Clause 23.
:fs ^ ❖ %
(c) This contract may be terminated by the Government at any time in accordance with the provisions of Clause 7 “TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT” and Clause 8 “DEFAULT”.
*****
5. RATES AND CHARGES
(a) The Government will pay the Contractor in accordance with the following rate schedule as full payment for all communication services furnished under this contract:
The sum of Sixteen Thousand Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($16,666.67) per channel per month, plus all terminal and transit taxes which may be imposed with respect to said channels or the use thereof.
(b) The rates set forth in paragraph (a) of this Clause are subject to adjustment to conform to any effective rate schedule filed with a public regulatory commission, in accordance with Clause 6 hereof.
‡ # ‡ ^ if:
7. TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT
(a) This contract may be terminated by the Government in accordance with this Clause in whole, or from time to time as to any one or more of said thirteen (13) channels, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected (1) by delivery to the Contractor at its office at 67 Broad Street, New_York 4, New York, of a Notice of Termination in writing specifying the extent to which this contract is terminated, and the date upon which such termination becomes effective, or (2) as provided in paragraph (d) of Clause 8 hereof.
*****
(c) After receipt of a Notice of Termination the Contractor shall submit to the Contracting Officer its *626 termination claim in the form and with the certification prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than two (2) years from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer upon request of the Contractor made in writing within such two (2) year period or authorized extension thereof. Upon failure of the Contractor to submit a termination claim within the time allowed, the Contracting Officer may determine, on the basis of information available to him, the amount, if any, but in no event to exceed Fifteen Million Six Hundred Thousand Dollars ($15,600,000.00) due to the Contractor by reason of the termination and shall thereupon pay to the Contractor the amount so determined. No profit shall be allowed to the Contractor in any determination rendered under this paragraph (c) as a result of the termination of the contract under paragraph (d) of this Clause 7.
(d) In the event that prior to the Completion Date the Government shall exercise its right of termination in whole under paragraph (a) of this Clause, the Government shall pay to the Contractor an amount equal to the aggregate of the costs incurred by the Contractor in connection with the manufacture, laying and operation of the cable, all determined in accordance with the Statement of Principles for consideration of costs set forth in Part IY of Section VIII of the Armed Services Procurement Regulations as in effect on the date of this contract, subject, however, to the following:
# sfc
(5) The amount payable to the Contractor pursuant to this paragraph (d) shall not exceed Fifteen Million Six Hundred Thousand Dollars ($15,600,-000.00). It is specifically understood that no profit shall be allowed to the Contractor for the settlement of any termination under this paragraph (d).
* * ^ # %
(h) Any dispute arising out of the termination of this contract under this Clause shall be decided in accordance with the procedure prescribed in the “Disputes” Clause hereof, provided, however, that if the Contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request an ex *627 ■tension of sucb time it shall have no right to appeal. In any case where the Contracting Officer has made a determination of the amount due the Contractor under this Clause 7, the Government shall pay to the Contractor the following: (i) if there is no right of appeal or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken the amount finally determined on such appeal.
(i) Any termination under this clause, in whole or in part, is subject to prior approval of such termination by the Secretary of the Air Force and shall not be effective until delivery to the Contractor at its office at 67 Broad Street, New York 4, New York (in addition to any other notices required to be delivered hereunder) of written evidence of such approval.
8. DEFAULT
(a) The Government may by delivery of written Notice of Default to the Contractor at its office at 67 Broad Street, New York 4, New York, terminate this contract as to one or more of said thirteen (13) channels if the Contractor fails, for any reason other than as provided in paragraph (b) of this Clause,
(1) To furnish, install and have ready for operation all facilities required to furnish the service hereunder by the date set forth in paragraph (b) of Clause 2, or to operate and maintain such facilities within and during the time specified herein or any extension thereof, and does not, as the case may be, furnish, install, have ready for operation, operate or maintain said facilities within a period of thirty (30) days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such a failure; or
(2) To perform any of the other provisions of this contract and does not cure such failure within a period of thirty (30) days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such a failure.
(b) The Contractor shall not be in default under any provision of this contract nor liable for any excess costs, if any failure to perform this contract arises out of causes beyond the control and without the fault or negli *628 gence of the Contractor. ‘Such causes include, but are not restricted to:
(1) acts of any Government, foreign or domestic, or any agency or branch thereof prohibiting or interfering with the manufacture, laying, landing, operation or maintenance of the cable or any failure of any Government, foreign or domestic, or 'any agency or branch thereof to grant approvals necessary for such manufacture, laying, landing, operation or maintenance for governmental and commercial service, provided, however, that the Contractor has used its best efforts to acquire any necessary approvals from foreign Governments,
(2) acts of God or of the public enemy, fires, explosions, floods, epidemics, quarantine restrictions; strikes, freight embargoes, unusually severe weather, court orders, civil commotion, war, act or consequence of war (whether or not there is a declaration of war), labor disturbances or inability to obtain materials and supplies, and defaults of subcontractors due to any of such causes unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet its obligations hereunder.
iji sH sji if: %
(d) If, after notice of termination of this contract under the provisions of paragraph (a) of this Clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this Clause, such Notice of Default shall be deemed to have been issued pursuant to Clause 7 of this contract entitled “Termination for the Convenience of the Government” and the rights and obligations of the parties hereto shall in such event be governed by such Clause.
(e) The rights and remedies of the Government and the Contractor provided in this 'Clause shall not be exclusive and are in addition to 'any other rights and remedies provided by law or under this contract.
(f) Any termination under this clause, in whole or in part, is subject to prior approval of such termination by the Secretary of the Air Force and shall not be effective until delivery to the Contractor at its office at 67 Broad Street, New York 4, New York (in addition to any other notices required to be delivered hereunder) of written evidence of such approval.
*629 16. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within thirty (30) days from date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence, be final and conclusive; provided that if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this Clause, the Contractor "shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
* % if: * *
23. APPROVAL OF CONTRACT
This contract shall be subject to the written approval of The Secretary of the Air Force or his duly authorized representative and shall not be binding until so approved.
14. (a) Although the requirement of the contract would have been satisfied with a cable having a capacity of 48 duplex teletypewriter (or 2 voice) channels, the plaintiff prepared plans for the laying of a cable having a capacity for 120 duplex teletypewriter (or 5 voice) channels.
(b) Except for the 13 teletype channels that were to be leased initially to the TTSAF under the contract, and such additional circuits as might be furnished subsequently under the terms of the contract to meet the needs of the defendant, the remainder of the 120 channels planned for the cable were to be available for commercial use or other purposes. In connection with the formulation of the contract, the USAF informed the plaintiff that its projected require *630 ments would probably exceed the 13 channels that were originally to be leased to the USAF.
(c) Commercial use of those cable circuits not required for military purposes was a vital element of the project, without which the project would not have been economically feasible for either the plaintiff or the defendant.
15. Among the facilities and approvals necessary for the performance of the contract were cable landing sites in the United States, the United Kingdom, Canada, Iceland, and Greenland, and appropriate governmental approvals with respect to such landing sites. The approval of the government of Denmark was necessary for the establishment of a cable landing site in Greenland.
16. The plaintiff proceeded as rapidly as possible during the summer of 1954 to complete the preliminary work essential to procuring and laying the cable provided for in the contract, including extensive surveys of the route, engineering and legal studies, and the procuring of stand-by commitments from financial institutions for the necessary financing.
17. (a) Among the work that had to be done by the plaintiff in order to perform the contract was the conduct of a survey by cable ship of the projected cable route. In order to meet the target date fixed hi the contract for the completion of the construction of the cable, it was necessary that the survey work be done during 1954. Accordingly, the plaintiff dispatched the cable ship John W. Mackay in September 1954 to Greenland for the purpose of conducting depth soundings, a study of suitable beaches for cable landing, determination of the most desirable bottom on which to lay the cable, and related studies, including a survey of available shore facilities.
(b) In view of the interest of the USAF in the survey, Captain H. D. Adams, of the USAF, accompanied the cable ship.
18. (a) In preparing to perform the contract, the plaintiff entered into an agreement with the Metropolitan Life Insurance Company for the eventual financing of the proposed cable. The anticipated total expense of the cable project was approximately 25 million dollars, of which about 17 million *631 dollars represented the anticipated cost of procuring the cable itself and the balance represented the expected cost of procuring repeaters, laying the cable, establishing shore facilities, and other expenses. The plaintiff and its related companies did not have the funds with which to finance the total anticipated expense; and, accordingly, they contracted with the Metropolitan Life Insurance Company for a loan in the amount of 15 million dollars. The balance of the total expense was to be defrayed out of 2 million dollars in cash that was available to the plaintiff and out of 8 million dollars that was to be raised through the issuance of convertible debentures.
(b) The plaintiff was obligated to pay a commitment fee to the Metropolitan Life Insurance Company, pending the actual transfer to the plaintiff of the funds needed for the construction of the cable. The liability for this fee was accumulated on the books of the plaintiff from October 1954 until January 1956, when it reached the agreed amount of $250,000. The liability was liquidated on October 4,1956, through the payment by the plaintiff of the accumulated amount to the Metropolitan Life Insurance Company.
19. (a) TAT-1 is a transatlantic telephone submarine cable connecting the United States, Canada, and the United Kingdom. It is owned to the extent of 50 percent by the American Telephone & Telegraph Company (hereinafter “AT&T”), to the extent of 41 percent by the General Post Office of the British government (hereinafter “the GPO”), and to the extent of 9 percent by the Canadian government.
(b) Prior to the laying of TAT-1, transatlantic telephone messages between the United States and the United Kingdom were transmitted by radio. The radio facilities at the United Kingdom end were owned by the GPO, and at the United States end they were owned by AT&T. Tolls on such messages were split 50-50 between AT&T and the GPO.
(c) Negotiations between the GPO and AT&T relative to TAT-1 began in 1951 or 1952. During the early phase of the negotiations, the GPO wanted a 50 percent interest in that cable. However, after the Canadian government expressed an interest in that cable, the GPO reduced its demand to an interest of 41 percent, which it subsequently acquired in TAT-1.
*632 20. In early June of 1954, the plaintiff requested the defendant’s State Department to render assistance to the plaintiff in obtaining the landing rights and other governmental authorizations that were necessary in order that the plaintiff could discharge its obligations under the contract. Accordingly, several conferences were arranged in Washington, D.C., for the latter part of June 1954.
21. (a) In the morning of June 25], 1954, there was held at the State Department a meeting that was attended by representatives of the State Department, of the USAF, and of the plaintiff. At that meeting, the USAF advised the State Department that the USAF had a compelling need for the facilities that were provided for in the contract; and that in order to obtain those facilities, it was important to the USAF that every means available to the defendant be used to obtain the necessary governmental approvals and authorizations as promptly as possible.
(b) Later in the day of June 25, 1954, a second conference was held at the State Department, attended by representatives of that Department, of the USAF, and of the plaintiff. A rumor had reached the State Department through a competitor of the plaintiff to the effect that an official of the GPO had stated that the plaintiff would not be granted a landing license in the United Kingdom. In view of this rumor, it was decided by the conferees that every effort should be made to obtain all possible support at the highest levels of the defendant preparatory to approaching the government of the United Kingdom. It was determined that the matter should be taken to the Assistant Director for Telecommunications of the Office of Defense Mobilization and to the Deputy Under Secretary of State — and that, if necessary, an effort should be made to obtain presidential support — in order that the defendant might make representations at the highest levels to the government of the United Kingdom.
22. (a) At all times material to this case, it was necessary for a company desiring to lay a cable between a point in the United States and a point in a foreign country to obtain a cable landing license from the appropriate agency of the defendant; and the prescribed procedure required that an *633 application for such, a license be submitted to the Federal Communications Commission (hereinafter “FCC”), showing (among other things) what the facilities were to be, the ownership of such facilities, the number of channels that would be operated, the type of service that would be offered, and the rates to be charged. It was customary for the FCC to serve copies of the application on the State Department, on all other interested agencies of the defendant, and on every common carrier that served the area that was to be served by the proposed cable. Up until May 10, 1954, it was the practice for the FCC, after processing the application and receiving comments from interested agencies and persons, to forward the application to the State Department with a recommendation as to the action that the President should take on the application, inasmuch as the final authority with respect to the issuance of a cable landing license was then vested in the President. After May 10, 1954, the final authority with respect to the issuance of a cable landing license was vested in the FCC, although such a license could be granted by the FCC only with the consent of the State Department.
(b) A company proposing to lay a cable between a point in the United States and a point overseas was required to obtain (in addition to a cable landing license, as indicated in paragraph (a) of this finding) a certificate of public convenience and necessity from the FCC. In considering whether to make such a certification, the FCC was required to afford the Secretary of State, the Secretary of the Army, the Secretary of the Navy, the governor of any State through which the line was to pass, and all interested parties an opportunity to submit comments.
23. In the afternoon of June 25, 1954, a meeting was held in the office of the Chairman of the FCC. It was attended by the Chairman and other personnel of the FCC, a representative of the State Department, representatives of the USAF, and representatives of the plaintiff. A representative of the plaintiff stated that the plaintiff would not wish to file a formal application with the FCC until the matter could be presented through official channels at about the same time to the governments of the foreign countries from which cable *634 landing licenses would have to be obtained, since it was regarded as highly undesirable for the matter to become public information prior to such time. In view of this factor, the Chairman of the FCC indicated that the matter would be brought to the attention of the other FCC Commissioners in an executive session. The representatives of the USAF indicated their strong interest in the fulfillment of the cable proj ect. The value of the proposed new cable for both military and commercial purposes, and the elements of national interest involved in the project, were discussed at length. The Chairman of the FCC stated that he could not assure the plaintiff of the FCC’s position pending the filing of a formal application, but that, from the facts presented to him, he would anticipate favorable action.
24. On June 30, 1954, a conference was held in the office of Deputy Under Secretary of State Bobert Murphy. This conference was attended by Mr. Murphy, other representatives of the State Department, and representatives of the plaintiff. Mr. Murphy recognized the national interest involved in the completion of the proposed cable project (which had been given the code name of “Deep Freeze”), and he proposed that negotiations with the government of the United Kingdom to procure a landing license be commenced by means of a letter from the Secretary of State to the United States Ambassador in the United Kingdom, and that the initial presentation be made by the United States Ambassador to the highest British Foreign Office level. Mr. Murphy also stated that the State Department would do everything in its power to assist the plaintiff in bringing its negotiations with the foreign governments to á satisfactory conclusion; and he offered to make a State Department representative available to assist the plaintiff in those negotiations.
25. On June 30, 1954, a conference was held in the office of William A. Porter, Assistant Director of Telecommunications, Office of Defense Mobilization. In addition to Mr. Porter, the conference was attended by a representative of the Department of Defense, representatives of the USAF, a representative of the Army, a representative of the State Department, and representatives of the plaintiff. Those present had been made aware of the elements of national interest *635 involved in the proposed cable project, and also of the rumored opposition of the GrPO to the proposed project. The; appropriate method of obtaining a strong statement of national policy in support of the proposal was discussed at length; and there was also consideration of the probable nature and direction of the anticipated British opposition. It was determined that a representative of the State Department would draft a memorandum concerning the elements of national policy involved in the project, anticipating in so far as possible the counter demands which might arisé during negotiations in the United Kingdom. Plans were made for the presentation of the problem to the Telecommunications Planning Committee, an interdepartmental committee of the defendant.
26. A meeting of the interdepartmental Telecommunications Planning Committee was held on July 2, 1954. The meeting was attended by representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and FCC. The proposed Deep Freeze cable project was discussed. The FCC representatives expressed concern over the effect of the proposed new cable on the competitive situation in the United States, with particular emphasis on the possibility that the great capacity of the cable might well result in seriously endangering or eliminating radiotelegraph competition. The FCC representatives also raised a question concerning the actual need of the facilities for commercial purposes, in view of the large capacity already available through existing cable and radio circuits. The representatives of the Department of Defense noted that there had been no military requirement established for the proposed cable, apart from the interest of the USAF. It was suggested that the FCC and the Office of Defense Mobilization must have a statement of “military necessity” from the Department of Defense, and that the FCC must give consideration to the commercial need for the additional facilities, and to the competitive effects which might result from the proposed cable.
27. At a meeting of the Joint Communications Electronics Committee of the Joint Chiefs of Staff, Department of Defense, that was held on July 7,1954, the USAF presented its *636 view that the impact of the proposed Deep Freeze cable on other commercial facilities might be of interest to the Department of Defense, but that the prime consideration on which the position of the Department of Defense should be based was whether, from the military standpoint, the proposed Deep Freeze Cable was a strategic necessity. After discussion, the Joint Communications Electronics Committee agreed that there was a definite strategic requirement for a high-speed cable in the North Atlantic, and that the USAF should prepare a strong justification to assist other agencies of the defendant in obtaining clearance for the installation of the cable.
28. The Deep Freeze cable project was discussed at a meeting of the Telecommunications Planning Committee on August 6, 1954. The advantages and disadvantages of the project were carefully analyzed and debated. The representative of the FCC indicated that its position was cooperative but could not be regarded as consent until after a formal application for a landing license was presented to and acted upon by the FCC. A motion to approve the installation of the cable, subject to the subsequent 'action of the FCC, was made and adopted by a vote of all the members of the committee, except that the FCC representative did not participate in the vote. A motion was unanimously adopted to the effect that it was “the sense of the Telecommunications Planning Committee that the State Department request its embassy in London to .arrange for Admiral Stone [the plaintiff’s president] to discuss, as a private United States individual, with government of the United Kingdom, the conditions under Which the United Kingdom might grant a landing license; further the State Department be authorized to inform Admiral Stone of the position of the Executive Branch that it is most desirable to have the facility fully owned by United States citizens. The State Department is requested to cooperate ’as necessary in 'any negotiations required with Denmark and Iceland relating to the route survey.”
29. (a) The State Department indicated to the plaintiff that the former did not wish to approach foreign govern *637 ments with respect to the securing of caíble landing licenses for the plaintiff until after the FCC had given approval in principle, 'at least, to the Deep Freeze cable project.
(b) Accordingly, under the date of August 9, 1954, the plaintiff addressed to the FCC a letter referring to previous conferences concerning the Deep Freeze cable project, and stating in part as follows:
If the Company is to complete the necessary cable ship surveys in foreign waters and malee the necessary approaches to the foreign governments affected so as to satisfy the time schedule established for the United States Air Force requirements, it is essential that the Department of State be in a position to approach the foreign governments involved in the immediate future.
Accordingly, we ask that the Commission consider this matter as promptly as possible and advise the State Department of its agreement to the project in principle in order that the Department may make appropriate representations to the foreign governments involved.
Since the project involves important military requirements and also delicate handling with several foreign governments, we will appreciate the Commission keeping the matter confidential until negotiations have been commenced abroad, at which time we will advise the Commission promptly.
(c) By means of a letter dated August 10,1954 from the chairman of the Telecommunications Planning Committee to the FCC, the latter was informed that the matter of the installation of the proposed Deep Freeze cable had been approved unanimously by the committee at a meeting on August 6, 1954, except that the FCC member of the committee had abstained from voting.
30. (a) On August 12, 1954, the FCC “approved in principle” the laying of the Deep Freeze cable, but reserved “the right upon application by the company [i.e., the plaintiff] for a United States cable landing license, to impose such terms and conditions as the Commission finds to be required in the public interest upon thorough investigation of the facts and considerations which may be brought to its attention.” Also, the action of the FCC was “subject to reconsideration if valid objections are raised on or before August 23, 1954 by any qualified party in interest.”
*638 (b) The FCC informed the State Department on August 12,1954 that the Deep Freeze cable project had been approved in principle, and recommended that the State Department instruct its missions abroad to assist the plaintiff in its negotiations with interested foreign governments.
(c) The FCC informed AT&T, The Western Union Telegraph Company, EGA Communications, Inc., and Press Wireless, Inc., of the approval of the Deep Freeze cable project in principle, and advised these companies that any comments which they might wish to make with respect to this action should be furnished to the FCC on or before August 23, 1954.
31. In response to objections from competing carriers, the FCC on August 23, 1954 withdrew its approval in principle of the proposed Deep Freeze cable.
32. In a letter dated August 31, 1954, an Assistant Secretary of Defense informed the FCC in part as follows:
The Department of Defense position with respect for the need for the proposed transatlantic cable is that the facility is required and is vital to the interest of National Security. It is of immediate strategic importance, vital to the defense of the United States and the operations of the Strategic Air Command, and is essential to 'the United States Air Force transatlantic air operations.
The proposed cable will provide communications capability to strategically important air bases, Greenland and Iceland. Existing cables are not routed via these locations.
^ *1» h» «{s
I recommend, based upon the contents of this letter, that immediate and positive support be given to the installation of a North Atlantic cable via Greenland and Iceland.
33. (a) On September 1, 1954, because of the strong representations that had been made to the FCC by agencies of the Department of Defense, the FCC reaffirmed its approval in principle of the proposed Deep Freeze cable project, but reserved “the right upon application by the company [i.e., the plaintiff] for a United States cable landing license to impose such terms and conditions as the Commission finds to be required in the public interest upon *639 thorough investigation of the facts and considerations which may be brought to its attention.” In taking this action, the FCC noted that many important questions of an economic nature concerning the competitive effects of the proposed Deep Freeze cable on other carriers operating in the North Atlantic were still unresolved.
(b) The FCC notified the Secretary of State and competing carriers of the action referred to in paragraph (a) of this finding.
34. On September 2, 1954, the Department of State informed the American Embassies in the United Kingdom, Denmark, and Iceland of the general nature of the proposed Deep Freeze cable project, and that it was a necessary military requirement of the United States. The Embassies were informed that representatives of the plaintiff would soon proceed to the United Kingdom, Denmark, and Iceland to discuss the question of landing licenses. The Embassies were “requested to lend every possible assistance to the representatives of the Company [plaintiff], stressing particularly the defense factors involved.”
35. (a) In early September of 1954, Admiral Ellery W. Stone, the plaintiff’s president, and John Hartman, another representative of the plaintiff, traveled to London for the purpose of commencing negotiations with the British government. The plaintiff’s representatives were accompanied by T. H. E. Nesbitt, of the State Department, who had an extensive background of experience in communications and who had been detailed by the State Department to assist in the negotiations because of the importance which the defendant attached to the Deep Freeze project and because of the complicated telecommunication factors involved in it. On September 9, 1954, Admiral Stone and Mr. Hartman, assisted by Mr. Nesbitt and personnel of the American Embassy in London, began negotiations with the British government, represented by the GPO, with a view toward procuring a license to land the proposed Deep Freeze cable in the United Kingdom.
(b) During the 1954 negotiations referred to in paragraph (a) of this finding, the plaintiff received the active support and assistance of the Department of State. Winthrop Brown, *640 Economic Counselor to the American Embassy in London, represented to the GPO that the proposed Deep Freeze cable had the full support of the defendant because of its importance to the United States; and Mr. Nesbitt informed the GPO that the defendant considered it essential to obtain relief from unreliable radio communications.
(c) In the early stage of the negotiations, the GPO noted that the proposed cable would contain sufficient telegraph capacity to equal the entire Atlantic cable facilities then in existence, and indicated that the GPO would have to look carefully at the effect of a sudden opening of such vast new capacity in the transatlantic telegraph service.
36. It had been the original intention of the plaintiff to file a formal application with the FCC for a cable landing license in the United States at about the time when the proposal was presented through official channels to the governments of the foreign countries from which landing licenses were needed. However, during the course of the September 1954 negotiations with the GPO, the GPO stated that the filing of a formal application with the FCC would publicize the project and thereby place undue pressure upon the GPO to approve the project. The GPO requested that no formal application be filed with the FCC until such time as the terms and conditions under which the GPO would grant a landing license in the United Kingdom were agreed upon between the GPO and the plaintiff. Upon the advice of the State Department, this request was acceded to by the plaintiff.
37. After the completion, in about the middle of September 1954, of the initial negotiations with the GPO, Admiral Stone and Messrs. Hartman and Nesbitt left London to initiate negotiations with the governments of other countries. It was the plaintiff’s understanding that the GPO had taken the proposal concerning the Deep Freeze cable project under advisement, and that in due course a reply would be received by the plaintiff from the GPO. In this connection, the GPO had informed the plaintiff that it would take some time for a determination to be made.
38. To overcome the objections of the GPO, the plaintiff sought, through the State Department, to have the military authorities of the defendant make representations to the Brit *641 ish military authorities respecting the vital military need for the proposed Deep Freeze cable. Pursuant to the plaintiff’s request, the defendant’s Joint Chiefs of Staff submitted to the British Chiefs of Staff a memorandum dated October 15, 1954, stating (among other things) that the Joint Chiefs of Staff supported the establishment of the proposed cable, that the Joint Chiefs of Staff had concluded “that there are important strategic needs for this cable,” that the Joint Chiefs of Staff viewed the proposed cable “as having a definite potential strategic value and a requirement for national defense and NATO,” and that the Department of Defense concurred in the importance of the cable. The memorandum concluded by stating that the Joint Chiefs of Staff “would be most grateful if the British Chiefs of Staff could support their views on the North Atlantic cable proposal and convey these views to the Government of the United Kingdom.”
39. No reply having been received from the GPO, Admiral Stone secured an interview with the British Minister of Defense in early November of 1954 in an effort to expedite a decision on the matter of obtaining a landing license in the United Kingdom. The plaintiff was subsequently informed that its proposal was under detailed and technical consideration, which would take additional time.
40. On March 10,1955, the government of the United Kingdom informed the Department of State that the former had “no desire to stand in the way of the provision of a new cable if it is essential to defence,” but that the government of the United Kingdom could not “see their way to permitting the projected cable to be used for purposes other than defence.”
41. On March 11, 1955, the State Department advised the plaintiff of the note dated March 10, 1955 from the British government. Several conferences thereafter took place between representatives of the plaintiff and of the State Department respecting the reply that should be made to the note from the British government. During those conferences, the State Department’s representatives suggested that the reply conclude with the request that the British government continue the negotiations with the plaintiff in an effort *642 to explore possible solutions which would be satisfactory to all parties; and the State Department’s representatives expressed the opinion that the plaintiff’s principal 'hope of ultimate success with the British government would be found in some formula for dividing ownership or tolls.
42. On March 18, 1955, the Department of State replied to the British note referred to in finding 40, stating (among other things) that “the Government of the United States reaffirms the urgent necessity of its defense requirements”; that “The United States Government appreciates the difficulties occasioned by certain commercial aspects of the proposed cable system and suggests that they might properly form the subject of further negotiations” between the British government and the plaintiff; and that the United States Government “urges the continu'ation of such negotiations and earnestly requests that the British Government give appropriate consideration to the views and requirements of the United States Government as set forth in this note.”
43. In late March of 1955, Admiral Stone had further conferences and communications with representatives of the British government, including a conference with the British Minister of Defense. Admiral Stone learned that as a result of the communication from the Department of State referred to in finding 42, the GPO would negotiate further with the plaintiff.
44. (a) In early April of 1955, the GPO informed personnel of the American Embassy in London that American companies had long held a predominant position in the telegraph business between the United States and the United Kingdom, and the GPO “had for some time aspired for a larger share of it,” and that the GPO “visualized increased * * * participation on two forms: (a) part ownership of the ‘Deep Freeze’ undertaking * * * and/or (b) utilization of certain ‘excess capacity’ in the ‘TAT’ cable for telegraphic purposes * * It was indicated that if the desire of the GPO partially to utilize TAT-1 for telegraph traffic to and from the United States were to materialize, the granting of a landing license to the plaintiff would be greatly facilitated.
*643 (b) Information concerning theposition of tb.e GPO, as set out in paragraph (a) of this finding, was transmitted by the American Embassy in London to the Department of State.
45. At the urging of Admiral Stone, the Secretary of State, while attending an international conference in Paris during May of 1955, advised the British Foreign Secretary that the defendant was still awaiting a reply to a mid-March note to the United Kingdom (see finding 42), and the Secretary of State ashed the British Foreign Secretary to give the matter a “push” on his return to London. The British Foreign Secretary agreed to do so.
46. On June 8, 1955, the government of the United Kingdom reaffirmed the position which it had taken on March 10, 1955 (see finding 40), to the effect that the British government was still unable to agree to the use of the proposed Deep Freeze cable for commercial purposes, although it had no desire to stand in the way of the construction of a new cable for defense purposes alone.
47. A factor in the refusal of the government of the United Kingdom to approve the construction of the Deep Freeze cable for commercial purposes was the expectation of that government that a portion of TAT-1, which was then under construction and was to be partially owned by the GPO, would be available for telegraphic traffic between the United Kingdom and the United States. This was known by interested agencies of the defendant.
48. At a conference between Admiral Stone and an official of the GPO that was held in London on June 15, 1955, Admiral Stone was advised that the GPO was prepared to consider alternative proposals, possibly involving part ownership of the proposed Deep Freeze cable by the GPO. It was the position of the GPO that a commercial facility owned controlled, and operated wholly by an American organization “would get nowhere.”
49. On June 16,1955, Admiral Stone conferred in London with the British Postmaster General. The latter’s position was that the American carriers already had a dominant position in transatlantic communications, and the proposed Deep Freeze cable would intensify such dominance; that because of this, the GPO could not agree to 100 percent owner *644 ship of Deep Freeze by the plaintiff; and with the heavy investment of the GPO in TAT-1, it was unlikely that Parliament would authorize a further investment in Deep Freeze. Nevertheless, the British Postmaster General indicated a willingness to consider “any alternative offer,” although he was unable to see any probability of agreement. During the course of the conference, the British Postmaster General expressed confidence in ultimately being able to get telegraph service into the United States via TAT-1.
50. (a) On June 28,19.55, Admiral Stone and John Hartman, representing the plaintiff, conferred with representatives of the State Department in Washington, and fully advised them of the then-current status of the negotiations with the government of the United Kingdom. The plaintiff’s representatives expressed the opinion that if further negotiations with the United Kingdom were to be successful, it would be necessary to give to the GPO concessions in the nature of an ownership interest in the proposed Deep Freeze cable.
(b) The USAF refused to participate in the conference of June 23, 1955, and reiterated the view, which it had previously stated, to the effect that it had a military requirement for the proposed Deep Freeze cable, but was unable to finance the cable as a purely defense venture.
51. On August 15,1955, the American Embassy in London submitted to the British Foreign Office a communication relative to the proposed Deep Freeze cable project, expressing regret over the decision of the British government “not to permit the landing of the cable in the United Kingdom unless it is to be used only for defense purposes,” and further stating as follows:
On the basis of the position outlined in the previously-mentioned note of the British Ambassador, it is inferred that telegraph facilities are foreseen as a component of the new transatlantic telephone cable (TAT) currently in the process of construction.
The United States Government feels that the question of the use of the transatlantic telephone cable (TAT) for telegraph traffic is not relevant to the application made by the Commercial Cable Company to the General Post Office. Moreover, no application to use the TAT cable for telegraph purposes has ever been lodged *645 with the Federal Communications Commission in Washington, nor has the United States Government any record of a formal or informal approach on the subject ever having 'been made. Her Majesty’s Government is aware that in accordance with the terms of the contract between the American Telephone and Telegraph Company (AT&T) and the General Post Office (GPO) the use of the transatlantic telephone cable for government or public telegraph service would have to be approved by the Federal Communications Commission as an agency of the United States Government. In this connection, the Commission is unable to foresee the circumstances which would be pertinent to a decision on this point and would have to consider the circumstances and factors prevailing at the time an application is made. However, at this time, it is extremely doubtful that permission to use the transatlantic telephone cable (TAT) to provide either government or public telegraph services would be approved.
52. The British Foreign Office submitted a note to the American Embassy in London on September 7, 1955, indicating that the British government must “continue to have regard to the effects on the present competitive situation, which is already favourable to the American companies, of the proposed operation by an American company of new facilities considerably in excess of all those now in existence”; and that the British government regarded the question of the use of TAT-1 for telegraph service as “relevant to the present issue in so far as the issue concerns the total telegraph capacity for public use on the North Atlantic route.”
53. At about the time when Admiral Stone and John Hartman, representing the plaintiff, began their negotiations with officials of the British government relative to the Deep Freeze project, Forrest L. Henderson, executive vice president of the plaintiff, was negotiating with officials of the Canadian government in an effort to secure permission to land and operate the Deep Freeze cable in Nova Scotia. The plaintiff engaged Canadian counsel to assist in those negotiations and to attempt to prevent the passage in the Canadian Parliament of a bill which would have had an adverse effect on the Deep Freeze project. Negotiations with the Canadian government extended over the period from September 1954 through June 1955, and the result was that the Canadian government *646 granted qualified approval for the landing of the cable in Canada, but imposed the condition that any commercial traffic terminating in Canada would have to be handled in Canada by the Canadian Overseas Telecommunications Company, a government-owned corporation, and that the collection of outbound commercial traffic in Canada would similarly have to be handled by the same corporation. The Canadian government did not impose any limitation Gn commercial traffic transiting through Canada. The plaintiff desired to remove the conditions previously mentioned, but did not regard such conditions as sufficiently severe to jeopardize the project, inasmuch as little commercial revenue had been expected from traffic terminating or originating in Canada. In July 1955, it was decided that further steps concerning the Canadian aspects of the Deep Freeze project would be held in abeyance until the situation with respect to the necessary authority in the United Kingdom was clarified.
54. During the period from September 1954 to February 1955, Admiral Stone and John Hartman, representing the plaintiff, conducted negotiations with officials of the Danish government in Copenhagen for the purpose of securing landing rights for the Deep Freeze cable project in Greenland, and they conducted similar negotiations with representatives of the Icelandic government in Reykjavik. The Danish government took the view, in conformity with its national policy, that it must 'operate all communications facilities on Danish territory or within its waters. The Icelandic government took the position that the commercial aspects of the proposed Deep Freeze cable conflicted with a concession previously granted to The Great Northern Telegraph Company, and that the plaintiff would have to make appropriate arrangements with that company. No final arrangements were made by the plaintiff with the Danish government, with the Icelandic government, or with The Great Northern Telegraph Company; and negotiations were halted pending a final resolution of the plaintiff’s application to the government of the United Kingdom.
55. (a) In November 1954, the Department of State asked the Department of Defense to express its views regarding *647 the insistence by the Danish government that the ownership of the portion of the Deep Freeze cable within the territorial waters of Greenland and the ownership of the dable terminals in Greenland must be vested in the Danish government. The communication to the Department of Defense concluded with the following statement:
* * * In your consideration of this question you will undoubtedly wish to bear in mind the precedent that might be created should American interests acquiesce in the present position of the Danish authorities * *. You will appreciate that it would be very difficult to deny a similar concession to the United Kingdom, Iceland, and Canada if it become [sic] known that we had granted it to Denmark or Greenland.
(b) The reply of the Department of Defense to the communication referred to in paragraph (a) of this finding stated (among other things) that “The Department of Defense is concerned exclusively with the provision of communications service for military use,” and that “the question of the control, ownership, operation and maintenance of such cable within the territorial waters of Greenland and the cable terminals in Greenland, is principally the concern of the Commercial Cable Company.”
56. (a) Admiral Stone and John Hartman returned to London and participated in further discussions with the GPO during the period October 10-28, 1955 relative to the proposed Deep Freeze project. The purpose of the plaintiff’s representatives was to propose participation in the project by the GPO, in view of the objections previously made by the GPO to the construction of a cable that would be wholly owned by the plaintiff.
(b) The initial proposal submitted by the plaintiff to the GPO during the discussions mentioned in paragraph (a) of this finding was that the GPO should participate in the Deep Freeze project from the outset, either by (1) acquiring a share in the ownership of the cable as a whole (as had been done by the GPO in connection with TAT-1), or (2) undertaking to provide a section of the cable. The plaintiff made plain that, in any event, the plaintiff must own not less than 50 percent of the proposed cable. The GPO representatives ex *648 pressed doubt concerning the financial soundness of the Deep Freeze project; and they also took the position that even if the financial uncertainties of the project could be eliminated, participation would be unattractive to the GPO because of the nature of the route.
(c) The representatives of the plaintiff next submitted an alternative proposal to the GPO, under which the plaintiff would proceed with the project without participation by the GPO initially and the GPO would have an option to purchase a share in the project at the end of a period that was to be agreed upon and of sufficient length to permit the technical and financial soundness of the new cable to be established. The representatives of the GPO indicated' that they did not find the plaintiff’s alternative proposal to be satisfactory, since the objections that led the GPO to reject the plaintiff’s original proposal, under which the new cable would be wholly owned by the plaintiff, applied with equal force to the alternative proposal outlined in this paragraph, since the proposed cable would be wholly owned by the plaintiff unless and until the GPO exercised its option. In the meantime, the transatlantic cable capacity in American ownership would be substantially increased.
(d) At the conclusion of the discussions mentioned in this finding, the representatives of the GPO agreed that the alternative proposals outlined by the plaintiff would be submitted to the British Postmaster General, who, in turn, would probably make a recommendation to the British cabinet.
(e) Upon returning to the United 'States after the conclusion of the negotiations referred to in the previous paragraphs of this finding, Admiral Stone informed representatives of the State Department and of other interested agencies of the defendant regarding the nature and outcome of the discussions in London.
57. In a letter dated February 21, 1956, the plaintiff was informed by the GPO that the latter had come to the conclusion “that it would not be possible to consider the ‘Deep Freeze’ project independently of a full review of the future arrangements for transatlantic telecommunications serv *649 ices,” and that it was not known at that time just when such review would be completed.
58. After learning that the British Postmaster General would probaibly send to the United States a delegation to discuss with representatives of the defendant the possibility of “a package deal” relative to transatlantic communications between the United Kingdom and the United States, the plaintiff on April 5, 1956 wrote a letter to the Assistant to the Director for Telecommunications, Office of Defense Mobilization, summarizing the immediate and critical problem confronting the plaintiff in its negotiations with the GPO concerning the proposed Deep Freeze project, and stating (among other things) as follows:
It is our view that the provision of the proposed cable facility via the route required by USAF. depends upon a sufficiently firm U.S. Government position to discourage the hope of the British Post Office that TAT will be made available for either commercial or Government telegraph use under normal conditions. Unless the British Post Office is convinced that the hope of obtaining a greater participation in US/UK telegraph traffic through use of TAT is a futile hope, they will not be interested in investing in Deep Freeze, nor will they permit this Company to go forward with the project on its own.
tfc # ^ ‡
We would very much appreciate, therefore, the support of your office in ensuring that during the forthcoming discussions the representatives of the British Post Office are made to understand that, except under circumstances of war or national emergency in which other facilities are not available, the U.S. Government does not propose to permit the use of TAT for telegraph service between the United States and the United Kingdom.
59. (a) Under the date of April 9, 1956, the Assistant to the Director for Telecommunications, Office of Defense Mobilization, wrote a letter to the Assistant ‘Secretary of Defense for Supply and Logistics asking that the Department of Defense state whether its previous actions and recommendations regarding the proposed Deep Freeze project were still valid.
*650 (b) The inquiry referred, to in paragraph (a) of this finding was 'answered on April 25, 1956 hy the Department of Defense, which stated that the position of the Department of Defense at that time regarding the Deep Freeze project was the same as had been stated in that Department’s letter of August 31,1954 (see finding 32).
60. (a) On May 4,1956, a meeting was held at the Office of Defense Mobilization for the purpose of arriving at a position to be taken by the defendant with respect to the matters that were to be discussed with the British delegation at a series of meetings .in Washington, D.C., beginning on May 16, 1956. The meeting was attended by representatives of the Office of Defense Mobilization, the State Department, the Department of Defense, and the FCC.
(b) With respect to the matter of the use of TAT-1 for public telegraph service, the persons attending the conference on May 4,1956, agreed that the policy of the defendant should be against the use of TAT-1 for public telegraph service except in case of national emergency or where adequate facilities at reasonable rates were not available via telegraph carriers, and that, in the latter instance, public telegraph service should be provided by existing telegraph carriers, which would lease channels in TAT-1 upon authorization by the FCC.
(c) With respect to the proposed Deep Freeze cable project, it was recommended by the FCC that the defendant should take the position in the meetings with the GPO that any agreement on the Deep Freeze project should be part of a package deal for British participation in all transatlantic cables between the United States and the United Kingdom, and that the GPO should conduct negotiations with the respective carriers concerning the acquisition of ownership interests. There was considerable discussion and some differences of opinion with respect to the recommendation by the FCC regarding a “package deal.” It was generally agreed between the persons attending the conference that before any discussion with the British representatives concerning Deep Freeze, further guidance from higher authority in the defendant was required.
*651 61. A further meeting between representatives of the Office of Defense Mobilization, Department of State, Department of Defense, and the FCC was held at the Office of Defense Mobilization on May 7,1956. At this meeting, there was discussion regarding the “vital need for Deep Freeze” and the “price” that the defendant should pay in obtaining Deep Freeze. Some of the persons present at the conference expressed the opinion that the Joint Chiefs of Staff should give the answer on these points.
62. (a) A further conference between representatives of the Office of Defense Mobilization, Department of State, Department of Defense, and the FCC was held on May 8,1956. At this conference, it was agreed that Assistant Secretary of Defense T. P. Pike would explore the position of the Department of Defense as to the importance at that time of the Deep Freeze cable project to national security, under the assumption that arrangements for this telegraph cable could be obtained only if it were agreed that the United Kingdom could have a partial ownership .interest in the cable and that this would result in serious impairment to the economic success, or possibly the continued existence, of the telegraph cable facilities already in operation across the North Atlantic.
(b) In accordance with the arrangement referred to in paragraph (a) of this finding, Assistant Secretary of Defense T. P. Pike wrote a letter on May 10, 1956 to the Director of the Office of Defense Mobilization, stating in part as follows:
* * * I can advise you that if, in the judgment of you and others in a position to form a conclusion, the “Deep Freeze” project, through joint ownership, is definitely established as jeopardizing the other in being trans-Atlantic telegraph services, then the Department of Defense would consider 'such an economic outcome as outweighing the importance to national security of the proposed cable. I would prefer, under these circumstances, to reconsider the entire matter to determine if some other arrangements could be adopted to meet the present and mobilization communications needs of the military services in this area. * * *
Please understand, however, that this in no way minimizes the Department of Defense’s opinion that the “Deep Freeze” project when implemented will constitute a valuable asset to our National Defense, not only *652 with respect to meeting mobilization requirements but, perhaps more importantly, to military operations in the extreme North Atlantic, including Continental Air Defense, prior to D-Day. We would urge that some 'formula be found to proceed with the project without incurring the very drastic results contemplated by the proposed assumption.
63. (a) Meetings were held in Washington, D.C., beginning on May 16, 1956 between delegations representing the defendant and the United Kingdom concerning telegraph service between the United States and the United Kingdom. The delegation from the United Kingdom included representatives from the G-PO and personnel from the British Embassy in Washington. The defendant’s delegation included representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and the FCC. These meetings were held on May 16,17,18,22, 23,24, and 25, 1956.
(b) The British desire that TAT-1 should be used for telegraph service as well !as for telephone service Was discussed at a morning meeting on May 22, 1956. The defendant’s delegation took the position that the defendants policy was against the use of TAT-1 for telegraph service except in case of national emergency or if the FCC should determine, in the public interest, that adequate facilities at reasonable rates were not available via telegraph carriers, in which case telegraph service should be provided by the leasing of channels in TAT-1 by existing telegraph carriers.
(c) The matter of the proposed Deep Freeze cable was discussed at an afternoon meeting on May 22, 1956. In response to an inquiry from the British delegation as to whether an agreement between the United Kingdom and the plaintiff under Which the GPO would have an ownership interest in the Deep Freeze cable would be acceptable to the United States, without the GPO obtaining similar interests in other transatlantic telegraph cables, a Commissioner of the FCC, who was a member of the defendant’s delegation, said that expressed defense needs had been the motivating factor of the project, which had originally been *653 for a o'alble in the sole ownership of the plaintiff; that the FCC had given approval to the project in principle so that negotiations might proceed; that subsequent to the time when the approval in principle was given, the circumstances had changed, notably in respect of the possibility of participation by the GPO in the project; and that the delicate balance among the American telegraph carriers in the North Atlantic might be affected in different ways, depending on the nature and extent of participation by the GPO in Deep Freeze and on the Way in which the United Kingdom dealt with the other American carriers. A member of the British delegation commented that the Deep Freeze proposal had been presented to the United Kingdom with the support of the defendant, but that there was now considerable doubt as to whether a contract on that basis would be regarded favorably by agencies of the defendant.
(d) No agreement was reached during the May 1956 meetings on the matters mentioned in paragraphs (b) and (c) of this finding.
64. In a letter which the FCC wrote to the Director of the Office of Defense Mobilization on June 20,1956, it was stated in part as follows:
It appears to the Commission that since the Department of Defense has modified its position with respect to the importance of the project and has said that its installation was not now considered to be so important as to over-ride other considerations, the Commission should revert to its normal procedures with respect to this entire project. As set forth above, under such procedures the Commission would not pass upon this project until an actual application is before it. Accordingly, the Commission proposes to withdraw its approval m principle of “Deep Freeze.” Such action would be without prejudice to any action which the Commission might take if and when an actual application for “Deep Freeze” or any similar project may be filed with it. It also should not be taken to indicate that the Commission would necessarily disapprove of “Deep Freeze” after consideration of all of the facts and considerations which may be brought to its attention in connection with the filing of an appropriate application. Withdrawal of its approval in principle would leave the Commission free to pass *654 upon “Deep Freeze” de novo if and when an application is filed therefor.
This letter is being sent to your Office because of its close association with this project and because of its responsibilities in the field of national defense and security. The Commission would appreciate receiving your views on this matter promptly so that it may formally advise all interested parties of its proposed course of action.
65. In a communication dated July 2, 1956, the British Postmaster General wrote a letter to the plaintiff, stating in part as follows :
Had this matter been one of military necessity and had the intention been to use the cable for defence purposes only, there would, as you know, be no obstacle on our part. But considering it, as we must, as a commercial project, my view is that there is no immediate or urgent need for a new facility of this kind; moreover, it seems to me that the proposed cable is an uneconomic and geographically hazardous method of providing Transatlantic telegraph circuits. In these circumstances, I have been obliged to reach the conclusion that your proposals cannot be accepted. * * *
66. (a) In a telegram which the American Embassy in London sent to the Department of State in Washington on July 6,1956, it was stated in part as follows:
Believe only hope salvaging this enterprise is for US Government to give British promptly formal note which TJSG states categorically once and for all that it will not repeat not agree to combined telegraph/telephone use of * * * [TAT-1] or any other cable except in case of national emergency; that it will not agree to multi-company ownership telegraph cable, and in any event finds no private interest in such joint ownership, and that it will not repeat not, conduct these negotiations on a government to government basis.
Beply should also stress to extent possible defense interest in Deep-Freeze.
(b) The view of the American Embassy in London, as outlined in paragraph (a) of this finding, was reaffirmed in a further communication dated July 12, 1956 from the American Embassy in London to the Department of State.
67. The Director of the Office of Defense Mobilization re *655 plied on July 9, 1956 to tbe letter dated June 20, 1956 from tbe FCC (see finding 64), and Stated in part as follows:
Tbe course of action you have set forth, under which you now propose to withdraw Commission approval in principle Of “Deep Freeze” and revert to normal procedures appears to be a proper course of action under the circumstances. We therefore have no suggestions or objections to offer in response to your letter, particularly m view of the fact that your proposed action is to be taken without prejudice if and when an actual application for the project may be filed with you.
68. (a) In a letter which the FCC wrote to the plaintiff’s president on July 19, 1956, it was stated in part as follows:
The Commission is now in receipt Of more recent correspondence from the Department of Defense which indicates that that Department has modified the nature and extent of the support which it had originally given to the Deep Freeze project. Accordingly, it appears to the Commission that the original basis upon which the Commission gave its approval in principle to the Deep Freeze project, despite the existence of important questions of an economic and competitive nature involving national communications policy for which this Commission is responsible, is no longer applicable. The Commission is therefore of the opinion that it 'should revert to normal procedures with respect to the Deep Freeze project.
*****
The Commission feels, however, thait before it formally acts to withdraw its approval in principle, your Company should be afforded a reasonable opportunity to comment on the Commission’s proposed course of action and to submit in writing such further data as you believe pertinent with respect thereto. Accordingly, the Commission will afford you an opportunity to submit such comments on or before August 13, 1956 and will delay final action until it has fully considered your comments.
(b) The State Department and other agencies of the defendant were informed by the FCC regarding the letter referred to in paragraph (a) of this finding.
69. The Department of State replied on July 23, 1956 to the communications from the American Embassy in London *656 referred to in finding 66. Tlie reply stated in part that in view of the position taken by the FCC on July 19,1956 (see finding 68), “the Department does not believe any useful purpose would be served in again approaching the British authorities in the sense suggested in the Embassy’s telegrams under reference.”
70. The plaintiff responded on August 9,1956 to the letter dated July 19, 1956 from the FCC (see finding 68), and strongly protested against the proposal by the FCC. The plaintiff’s communication concluded with the following paragraph:
It is this Company’s position that it is entitled to the continuation of the Commission’s approval in principle and to the further support of our Government because Deep Freeze is a defense requirement; but also because this Company is a common carrier of international telegraph communications seeking to maintain and improve its cable facilities in accordance with its landing licenses and its obligations to the public. For the foregoing reasons, the Company opposes the Commission’s proposal and urges that, to the contrary, our Government afford its further support to the project.
71. In a letter dated September 19,19516, the FCC informed the plaintiff’s president in part as follows:
The nature and tenor of the support originally given Deep Freeze by the Defense agencies whs similar to that given the AT&T cable project [TAT-1] in the above-cited matter. In each dase, despite other problems, we acted affirmatively. Now, however, the tenor of the support given by the Defense agencies to Deep Freeze has changed to the extent that the Department of Defense has indicated it would wish to reconsider its position in support of Deep Freeze if it were to appear that certain adverse effects might flow from its operation. Accordingly, before we can continue our approval in principle of Deep Freeze We must determine whether such adverse effects will, in fact, result from Deep Freeze.
We wish to make it clear that hi withdrawing our approval in principle we are not prejudging this matter. We are merely saying, that this Commission cannot, 'and will not, in the absence of some overriding considerations no longer present, take a position with respect to Deep Freeze, or any other project, until all *657 interested parties have been afforded an opportunity to be beard and until the questions which exist have been resolved. It is entirely possible that after resolving, all of the facts and considerations brought to its attention, the Commission might determine that the foreseeable benefits to be gained from Deep Freeze would outweigh any possible adverse effects. In such an eventuality the Commission would, of course, reaffirm its approval of the project.
:fc * * *
In view of all of the foregoing, you are advised that, effective immediately, the approval in principle of Deep Freeze is withdrawn without prejudice to consideration de novo of any applications which your company may desire to file for this project.
72. (a) On September 26, 1956, the plaintiff was orally advised by the USAF not to incur any further expenses on the Deep Freeze project until the USAF “decides what it is going to do in view of the present circumstances.”
(b) The advice referred to in paragraph (a) of this finding was confirmed by the USAF on October 29, 1956.
73. (a) On October 4, 1956, the plaintiff’s executive vice president wrote a letter to the Metropolitan Life Insurance Company (see finding 18), stating in part as follows:
It now appears that the construction of the caíble will extend 'beyond the dates provided in the Purchase Agreement. Moreover, it is probable that the project will take the form of a cable used solely for governmental purposes or one owned jointly by The Commercial Caíble Company and one or more foreign government administrations. In any event, it is cle'ar that the financial arrangements should be different in kind and amount from those contemplated by the Purchase Agreement.
.As we have already mentioned, we should like to discuss these questions with you in the future. In the meantime, however, it would seem appropriate to terminate our existing financing arrangements, including the Purchase Agreement, and the commitment fee -accruing under that agreement. We -accordingly suggest that the Purchase Agreement, as amended, be terminated effective as of October 4,1956, upon our payment to you on that date of the commitment fee accrued to that date.
*658 (b) The proposal outlined in the letter of October 4,1956 was accepted by the Metropolitan Life Insurance Company.
74. In the fall of 1956, the requirements of the USAF for transatlantic telecommunications service were expanding. The USAF had new and urgent requirements associated with the newly acquired bases in Spain for the Strategic Air Command. The requirements were not only increasing drastically, but they were changing, in that there was a greater need than theretofore for circuits that could be used for voice and data transmission. The USAF began to be interested in possible projects that would provide for it more extensive transatlantic telecommunications service than that contemplated by the Deep Freeze project.
75. In a letter which the USAF wrote to the plaintiff’s president on July 18,1957, it was stated in part as follows:
As you are undoubtedly aware, the military services are still interested in cable service via the North Atlantic route. The comparison in cost to the military of the original “Deep Freeze” project with the cost of proceeding on a “defense only” basis, however, has caused some delay. A considerable period of time has been required to perform the review of channel requirements, cost analysis, inter-service coordination, etc., essential to securing approval of a project of this magnitude. This work has now been completed and I am anticipating an early decision on the matter. Inasmuch as approval authority for the project is vested in the Secretary of Defense I am not in a position to state a specific date by which a decision will have been reached.
76. A communication dated November 20, 1957 from the USAF to the plaintiff’s president stated in part as follows:
The Joint Chiefs of Staff are currently considering the “Deep Freeze” cable project. In the event that body favorably considers going ahead with the project, the final approval of the Secretary of Defense will be sought. A final decision is expected within three months.
You of course appreciate that should the proposed project be approved, it will differ substantially from that covered in our present contract. Under the circumstances it is anticipated that negotiations for implementation will be conducted with all interested and qualified commercial concerns, including your own, on a competitive basis.
*659 77. (a) In a letter dated June 13, 1958 and addressed to the Directorate of Procurement and Production of the TTSAF, the plaintiff’s president stated in part as follows:
As indicated in our letter of January 3,1958, we were instructed in September 1956 by representatives of Headquarters U.S.A.F. to incur no further expenses under the subject contract, and these instructions have been reaffirmed on other occasions. Nearly two years have elapsed since these instructions and further, it now appears that the “Deep Freeze” project is to be replaced by the new “Quick Freeze” project. We request, accordingly, that the subject contract be terminated for the convenience of the Government pursuant to clause 7 thereof, and that pending such termination by the Government you send us written confirmation of the above-mentioned instructions of U.S.A.F. Headquarters representatives to avoid further expenditures on our part and a consequent increase in our ultimate termination claim.
If the contract were terminated at this time, our termination claim, calculated in accordance with the provisions of clause 7, would amount to $778,466.41. As pointed out in our letter of April 11, 1958, termination of the contract and payment of this claim would make available to the Air Force extensive 'survey and engineering data which would be advantageous to the Government in connection with the current “Quick Freeze” project.
(b) The reply of the USAF to the plaintiff’s letter of June 13, 1958 stated in part as follows:
Your letter of 13 June 1958, suggested a termination of Contract AF 33 (600) -26137 for the convenience of the Government. The contract obligated the Government to lease certain channels on a cable which you were to construct. Since the cable has not been completed, the Government would appear to have no obligation which can be terminated.
78. In a communication dated February 20,1958 from the Assistant Secretary of Defense for Supply and Logistics to the Director of the Office of Defense Mobilization, it was stated in part as follows:
The Department of Defense has reconsidered the entire matter of the “DEEP FREEZE” project. Recent missile and international developments 'have increased *660 the strategic essentiality of such, a project. Requirements now exist, in support of the Ballistics Missile Program, for reliable 'high quality voice, data, and teletype circuits in addition to those which were previously to be met by “DEEP FREEZE.” Therefore, the United States Air Force has been authorized to negotiate with interested and qualified carriers for installation of a United States-United Kingdom trans-At] antic submarine cable for defense purposes only, such a cable to provide voice, data, and teletype services between points in the United States, Newfoundland, Greenland, Iceland, and the United Kingdom (also continental Europe) . In order to meet current and future requirements, a capability of up to thirty-six (36) voice channels in the cable is being considered. To prevent confusion with U.S. Navy “DEEP FREEZE” operations in the Antarctic the submarine cable project has been officially renamed “QUICK FREEZE.”
The Department of Defense reaffirms the strategic importance of a trans-Atlantic submarine cable between the United States and the United Kingdom routed via Newfoundland, Greenland, and Iceland. Your support of this project, to include coordination with the Department of State and the Federal Communications Commission in obtaining cable landing rights is solicited. Regardless of the new urgency attached to this project, it is considered most prudent to obtain advance approval of cable landing rights by the countries involved prior to award of a contract committing government funds. In order to eliminate delay, negotiations for such advance approval should be initiated without delay.
79. The plaintiff, in its efforts to fulfill its obligations under the contract, incurred the following expenses, totaling $751,072.06:
(a) A commitment fee in the amount of $250,000 was paid to the Metropolitan Life Insurance Company (see finding IS).
(b) The sum of $169,841.51 was expended in conducting the survey by cable ship of the projected cable route (see finding 17).
(c) A total of $122,303.40 was expended for the salaries of executive and engineer personnel.
(d) Legal fees were paid in the aggregate amount of $102,233.57.
*661 (e) Expenses of employees in the total amount of $78,-867.91 were paid.
(f) Tbe sum of $9,636 was expended on a geodetic surrey.
(!g) Audit fees were paid in the aggregate amount of $9,500.
(h) The plaintiff sustained a net loss of $880.29 in connection with the acquisition and disposal of property in Massachusetts which the plaintiff expected to use as a landing site for the Deep Freeze cable.
(i) The plaintiff expended $1,807.05 for the expenses of outside personnel.
(j) The plaintiff expended $686.46 for classified messages to the Department of State.
(k) The plaintiff expended $7,066.49 in connection with the printing of notes and indentures for a debenture issue to finance the Deep Freeze project.
(l) The plaintiff incurred miscellaneous expenses totaling $1,249.38.
80. The plaintiff is the owner of the claim in suit. There has been no assignment or transfer of the claim, or of any part of it.
CONCLUSION or Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

 Prior to the trial on which this report is based, a motion for summary-judgment was filed by the defendant, and such motion was denied by the court on May 14, 1965 (170 Ct. Cl. 813).